Ware, *et al., vs.* Richardson.

tunity to dictate, and to examine its provisions after they were put to paper, the facts warrant us in believing; and these circumstances, coupled with the total absence of proof, to show any one had sought to exercise any influence over him, ought, when his capacity is *fully established,* to be conclusive of the validity of the paper as a testamentary disposition of his property.

We see nothing in the requirements of law or the facts of the case, to induce us to come to a conclusion different from that of the orphans court, and therefore affirm their decision.

*Order affirmed, with costs.*

---

## Nathan H. Ware, Eliza E. Ware, Julia H. Barron, and Jacob Albert, *vs.* Charles R. Richardson.

Whatever may have been the origin or philosophy of the rule in *Shelley's case,* it has been fully recognised and adopted as the settled law of Maryland, and must, with its qualifications, prevail as a part of our system of real law.

Where the words *"heirs"* or *"heirs of the body"* are used, this rule requires them to be treated as words of limitation and not of purchase, and it imputes to the grantor or testator, in legal contemplation, an intention to use them in their legal sense, and to give them their legal effect, though a real intention to the contrary would thereby be defeated.

But where the testator or grantor annexes words of explanation to the word *"heirs,"* indicating that he meant to use them in a qualified sense as a mere *descriptio personarum,* or particular designation of certain individuals, and that *they,* and not the ancestor, were to be the *termini* from which the succession to the estate was to emanate, the rule does not apply.

The expressions, *"heirs now living,"* *"children,"* *"issue,"* &c., are words of limitation or purchase, as will best accord with the manifest intention of him who employs them; in such case the intention prevails against the strict construction.

Where the estate limited to the ancestor is an equitable or trust estate and that to the heirs an executed use or a legal estate, the two will not coalesce

64        v.3

Ware, *et al., vs.* Richardson.

in the ancestor, and so if the estate for life be a legal and that to the heirs an equitable estate; in such cases the rule does not apply.

If the case be one where the *intention* of the grantor is to prevail against the strict construction, the court will construe the deed as a *feoffment* or a *bargain and sale,* as will most effectually accomplish that intention.

A use, before the statute of uses, was a mere confidence in a friend, that the feoffees of the land would permit the feoffer and his heirs, or such other person as he might designate to receive the profits of the land.

By the statute of uses, the use was transferred into possession by converting the estate or interest of the *cestui que use* into a legal estate, and by destroying the intermediate estate of the feoffee.

A trust is a use not executed under the statute of uses in the *cestui que use,* but the legal estate is vested in the grantee or trustee.

The mere interposition of a trustee to protect a trust estate in a third person, even though a married woman, will not prevent the use being executed, unless there is attached to the trustee the performance of some active functions or duties to support the trust.

Where a devise or deed is to a person in trust *to collect and pay over* the rents and profits to another, the use is executed in the trustee, but where the devise is in trust to permit another to *enjoy* the rents and profits, the use is executed in the *cestui que use.*

Most of the elementary writers broadly assert, that where the trustee is to hold in trust for the *'sole and separate use* of a *feme covert,* it is a trust and not an executed use, but most of the cases cited by them are where some active duties are imposed upon the trustee, and do not sustain the proposition as broadly announced.

In such cases of trusts for the separate use of married women, the intention of the grantor is to prevail, but with the qualification that it must not controvert or defeat the established rules of interpretation.

Unless the deed assigns to the trustee the performance of some duty necessary for the enjoyment of the estate by the *feme covert,* the legal estate will not vest in the trustee.

The rights and powers of married women are ordinarily merged in those of the husband, and the medium of a trustee is necessary to vest her with sole and independent powers.

Where bequests or conveyances are made to married women for their separate use, without the nomination of a trustee, the husband will, in equity, be considered as the trustee, and will be required to comply with the intentions of the donor.

A separate estate in real property cannot be enjoyed by a married woman except through the interposition of a trustee, and this circumstance of itself implies the performance of some active duties on his part.

By the executing of the use in the wife, the marital rights of the husband are established over the property, and this result is a reason why a different

construction should be given to the instrument, in order to effectuate the intention of the grantor.

The modern decisions favor a more liberal construction of deeds and wills, in order to reach the real intent of the makers, and in all cases of devises or conveyances to trustees for the *separate use of married women*, this court will, if possible, so construe them as to vest the legal estate in the trustees, because this will best effectuate the intention of the donor.

In questions like the present, the same mode of construction is adopted in cases of deeds as in cases of wills, and the same rule is recognized.

Wherever a conveyance may take effect either at common law or under the statute of uses it shall operate at common law, unless the intention of the parties appear to the contrary.

A deed conveyed real estate to a trustee "*in trust*," that a married woman "shall and may, during her life, have, hold, use, occupy and enjoy" the same, "and the rents, issues and profits thereof," "to her own proper use and benefit notwithstanding her coverture, and that without the let, trouble or control of her present or any future husband," or being liable for his debts, "as fully in every respect as if she was sole and unmarried, and from and immediately after her death, then *to and for the use and benefit of her legal heirs and representatives.*" HELD:

That this deed created but a mere equitable life estate in the married woman, and that it executed the legal estate in her heirs.

The right of an immediate appeal from any decree or order, except a final decree, or order in the nature of a final decree, was taken away by the act of 1830, ch. 185, and though restored by the act of 1841, ch 11, yet the party may waive it, and on appeal from the final decree allege error in all previous interlocutory decrees or orders passed in the cause.

Though the act of 1830, ch. 185, expressly enumerates, among the decrees which are not to be regarded as final, those *for the sale of real estate,* yet it was not intended to embrace a case where the liability of the property to be sold was the very question to be determined by the court.

An order or decree finally settling any disputed right or interest of the parties is a final decree, and as such will warrant an appeal.

If a creditor's bill has been converted into a proceeding for a sale, for the purpose of distribution, by the consent and agreement of the parties in the court below, the irregularity, if it be such, cannot be taken advantage of in this court upon appeal.

Where a case is submitted on bill and answer without a replication, the answer is to be taken as true.

A bill was upon its face a creditor's bill for the sale of a deceased's real estate. The answer denied the liability of the estate to be sold for the debts, and did not admit the insufficiency of the personalty, but stated that the real estate was not susceptible of division, and assents to its being sold by a decree, and that the proceeds should be brought into court to be distributed according to the respective titles of the parties. No replication

was put in and no proof offered. It was then agreed that the cause should be submitted on bill and answer, without argument, for a decree, and a decree accordingly passed directing a sale and that the proceeds be brought into court, and the sale was then made, and by agreement of parties ratified by the court. HELD:

That though this decree passed a good title to the purchaser as against the parties to the proceedings, yet it does not conclude the rights of the parties to the fund arising from the proceeds of sale, and such rights are open for adjudication upon appeal from the decree ratifying the auditor's account distributing the proceeds.

In assenting to the decree the complainants took it upon the condition annexed by defendants, that it should be a decree for a sale, reserving, for adjustment and decision, the distribution of the proceeds until they should be brought into court, and then to abide the decision of the court as to distribution as if the property remained unsold, upon the respective titles of the parties claiming an interest therein.

The agreement consenting to the decree upon these terms dispensed with the proof necessary to support the bill of the creditor, and authorised a sale under that bill, but expressly reserving the equities of the parties.

It is not a case of consent giving jurisdiction, because the bill states facts which give jurisdiction, and the agreement but dispenses with proof and matter of form, and submits to such a decree as the court had the clear power to pass without an agreement upon proper averments and proof.

There can be no doubt but that the agreement can have the effect to suspend or take away that conclusive character which, in ordinary cases, would attach to the decree. It is simply a decree upon terms proposed by the defendants and accepted by the complainants.

It is a common practice for courts of equity to pass decrees reserving the equities of the parties for some future decree of the court, and though this was not done in express terms in this case, yet such was the design of both the court and the parties when the decree was passed.

Under certain circumstances, this court will modify the rigid rules of practice and temper the harsh consequences of decrees to promote the ends of justice and effectuate the intention of parties.

APPEAL from the Equity Side of Baltimore county court.

This appeal was taken by the appellants, (the defendants below,) from an order of the county court, passed on the 16th of November 1849, finally ratifying and confirming the auditor's account of the 9th of March 1848, which distributed the proceeds of sale, and overruling their exceptions thereto. The proceedings in the case commencing with the bill filed by the appellee, on the 28th of December 1846, are so fully stated

in the opinion of this court as to render any additional statement unnecessary. Upon the passage of the order appealed from, the following opinion was delivered by LE GRAND, A. J.:

"The fund for distribution in this case has been derived from the sale of property directed to be sold by a decree of this court. The property was, by deed of A. Kennedy, conveyed in trust to Samuel N. Ridgely, on the 20th of March 1802.

All the exceptions filed in this case, save that in which the statute of limitations is relied upon, are founded on the idea that under this deed Elizabeth Richardson had but a life estate, and that on her death the estate passed to her children, Charles and Robert, in fee-simple.

In the argumunt of the case there was no difference of opinion as to the principles of law relied on by counsel, the only contest between them being in relation to the true construction of the deed itself, those for the complainant contending that by the deed the heirs of Elizabeth Richardson were to have an equitable estate, whilst on the opposite side it was insisted upon that the trust ceased on the death of Elizabeth and that the heirs took a legal estate, and that therefore the rule in *Shelley's* case did not apply so as to give to Elizabeth Richardson such an estate in the property as to make it responsible for her debts.

The construction which I place on this deed is, that the grantee had by it granted to him and his heirs "*forever*" the legal estate, and that it should be read as though the words "*in trust*" had been inserted immediately after the word "then," which follows those of "after the death of the said Elizabeth;" or in other words, that the language, "*further trust*," occurring in the deed, is just as applicable to that part of the deed which refers to the heirs and representatives of Elizabeth Richardson, as it is to that portion which refers directly to Elizabeth Richardson herself. In this view I have the concurrence of the chief justice, (FRICK,) whose opinion I have obtained. This being so, there is no doubt that Elizabeth Richardson, under this deed, took an estate in fee,

the rule being, and so admitted, that an equitable estate of freehold will so unite with an equitable remainder to the heirs of the ancestor to make such ancestor tenant in fee. The exceptions founded on the construction of the deed must, therefore, be overruled.

The statute of limitations has been pleaded to an item in the claim of the estate of Robert R. Richardson for the proceeds of sale of two negroes, the property of the said Robert R. Richardson. These negroes were sold by Elizabeth Richardson and her sons, Charles and Robert, under the belief that they were the property of Elizabeth for her life, and then that of Charles and Robert Richardson, her sons. The proof shows that they beloged to the estate of Robert Richardson, senior; Mrs. Richardson, as executrix, is not charged in the inventory of her husband's personal property with these negroes, and although the proceeds of this sale were applied to the payment of the debts of the estate, as is shown by the affidavit of Mr. Latrobe, her estate is, of course, debtor to that of her husband for their value, it not being charged to her in the inventory. There is no dispute about the amount or the facts, the only question being, whether an administrator of an executrix, in settling her account under the act of 1820, ch. 174, can, by so doing, take a claim against her out of the statute of limitations? Under our act of 1798, ch. 101, no administrator or executor is bound to plead the statute of limitations, the matter is left entirely to his honest discretion. This being so, it was competent for Charles Richardson, as administrator on the estate of his mother, to admit the claim precisely as she could have done. In fact the act of 1820 makes the administrator of the executor, the administrator on the estate of the testator of the executor. This view is fully sustained by the opinion of this court in the case of *Donnell vs. Howard*, filed in 1841. There is no cause shown in support of the exceptions."

The cause was argued before ECCLESTON, MASON and TUCK, J.

The cause was first argued orally at the bar, but upon application of the appellee a re-argument was ordered, when very lengthy and elaborate written arguments were filed, which the Reporter is necessarily compelled to abridge, but in so doing he has endeavored to give concisely the views of counsel and all the authorities upon the several points discussed by them.

*Thos. S. Alexander* for the appellants.

This appeal presents two general questions:—1st. Whether the claims of complainant are sufficiently established as against the real estate of the deceased? 2nd. Whether Mrs. Richardson had an estate of inheritance in the lands described in the bill?

The appellee insists, that his claims were established by the decree directing the sale, and that such decree cannot be reviewed on this appeal. The act of 1830, ch. 185, deprived the party aggrieved of his right to appeal from a decree directing a sale of real or personal property. 10 *G. & J.*, 377, *Hatton vs. Weems.* 11 *G. & J.*, 362, *Lee vs. Pindle.* 12 *G. & J.*, 83, *Hatton vs. Weems.* And though this right to an immediate appeal is restored by the act of 1841, ch. 11, he may waive it, and on an appeal from the final decree, or order in the nature of a final decree, allege error in the decree directing a sale, or any other decree or order theretofore passed in the cause. 3 *Gill*, 138, *Dugan vs. Gittings.* Hence, on this appeal from the order distributing the proceeds, the appellant may show error in the original decree.

Was there then error in that decree? The answer admits, that Mrs. Richardson died indebted to the estate of her testator, but denies the existence of the second claim charged in the bill, and does not admit the insufficiency of the personal estate. The cause was heard on bill and answer. In such circumstances, the complainant can rely on such parts of his bill only as are distinctly admitted by the answer. Hence the court, treating the bill as a creditor's bill simply, ought to have decided that the second claim and the insufficiency of

the personalty were not established, and for these reasons dismissed the bill.

It doubtless would have been so dismissed, but for the passages in the conclusion of the answer, which admit that the property belonged to the complainant and his brother, in equal moieties, and was not susceptible of equal partition, and that a sale would be advantageous to all parties; and submit that a decree may be passed for a sale, and the proceeds be brought into court for distribution under the court's direction.   We shall not inquire, whether this consent justified the court in passing the decree.   In either alternative the conclusion must be the same.   If consent did not give jurisdiction, the decree was and is erroneous.   If the submission in the answer warranted the decree, then the rights of the complainant, to have satisfaction of his alleged claims out of the real assets, were reserved for future discussion.   And the question now is, by what standard are those rights to be determined?   Evidently by the standard prescribed by the agreement of the parties. By the case made on bill and answer.   Hence the complainant is not entitled to satisfaction out of the proceeds of the real estate, because:—1st. He has shown no title in himself as administrator *d. b. n.*, to recover the balance due by the executrix to the estate of her testator.   2nd. His individual claim is not proved to exist in fact.   3rd. The insufficiency of the personal estate is not established.   Upon this brief argument the case may be rested.

But if we suppose, for the sake of further argument, that complainant was at liberty to disregard his submission of the cause on bill and answer, and to sustain his case by proof, we then insist, that sufficient proof has not been produced.

First, there is literally no proof of the insufficiency of the personal estate.   This question is presented by the pleadings. The objection is not to the averments in the bill.   They state a case of clear jurisdiction, and hence no exception is needed to entitle us to rely on the objection under the act of 1841, ch. 163.

Secondly, has complainant shown himself a creditor of Mrs.

Ware, *et al.*, *vs.* Richardson.

Richardson? and if so, to what amount? His individual claim is denied by the answer, is not proved, and is virtually abandoned. Is he entitled as administrator *d. b. n.*, to recover from the estate of the executrix the balance due from her to the estate of her testator? Prior to the act of 1798, ch. 101, the authority of the administrator *d. b. n.* was limited to assets unadministered by the original executor. *Hagthorp vs. Hook*, 1 *G. & J.*, 274. And by that act, sub-ch. 14, his authority is expressly limited to "assets not converted into money, and not distributed or delivered, or retained by the former executor." The act of 1820, ch. 174, empowers the orphans court to order the administrator of a deceased executor, to deliver over to the administrator *d. b. n.* of the original testator, all the bonds, &c., which such executor may have taken, received or had, as executor, at the time of his death, and to pay over all the money in the hands of said executor, as such, at the time of his death. Now on this act we remark, first, that the order of the orphans court is necessary to vest title in the administrator *d. b. n.* to the securities, and moneys which he would recover from the representative of the deceased executrix. *West vs. Chappell*, 5 *Gill*, 228. Secondly, the securities to be delivered, are those which were originally assets, or securities into which assets may be specifically traced. And by parity of reason, the money which may be delivered, is money having an ear-mark, whereby it may be identified as assets, or as the representative of assets. In a more general sense, money wasted, or assets misapplied, is money in the hands of the executor. But it is settled by *Sibley vs. Williams*, 3 *G. & J.*, 52, that for assets wasted the party aggrieved, whether creditor, legatee or next of kin, must pursue his remedy against the executor of the executor. For the value of such assets, therefore, the executor of the executor cannot be required to answer to the administrator *d. b. n.* of the first testator.

To this it is answered, that the administrator *d. b. n.* of the first testator, is the administrator of the deceased executor, and this union of the representative capacity of creditor and

65      v.3

debtor, dispenses with the necessity for the action of the orphans court. This principle requires for its application in any given case, the union in one person, in different capacities, of a clear title to demand, and of a clear duty to pay. But if an order of the orphans court is necessary to perfect the title of the administrator *d. b. n.,* to demand possession of bonds, &c., belonging to the first testator, in the hands of a third person, acquiring them as executor of the executor of such testator; or if such order is required to justify their delivery by such executor, to another person claiming as such administrator *d. b. n.,* the union of these two capacities in one person, would not dispense with the necessity for a like order to warrant the transfer, or presumption of a transfer, of the securities acquired by him in one capacity, into his possession under his other and better title. The order is essential to the perfection of the title, and, in its absence, no title can be affirmed to exist in the administrator *d. b. n.*

We then inquire, what was the extent of the indebtedness of the executrix deceased, to the estate of her testator? The claim was submitted for hearing on bill and answer, and no subsequent agreement was made to warrant a change of the issue framed by the pleadings, or the introduction of testimony for the purpose of enlarging the claim. The claim thus admitted is for $496.92. The auditor states it as for $1543.73, on the authority of an administration account of Mrs. Richardson, as executrix of Robert, passed by the complainant, as administrator of Mrs. Richardson, after her death. This evidence was irregularly introduced, and for this reason ought to be disregarded. *Stockett vs. Jones,* 10 *G. & J.,* 276. It is relied on as evidence of a claim, entirely at variance with the claim set out in the bill. The claim, as stated in the bill, is admitted by the answer, and the defendants could not controvert it by the introduction of evidence. It would seem to be equally reasonable and clear, that the complainant ought not to be permitted to introduce evidence for the purpose of enlarging it. But the evidence offered is insufficient for the purpose. The account passed by the administrator of the

executrix, would be evidence against him in favor of third persons. But it would violate justice and the rules of evidence, to permit him to avail himself of his character of administrator of the executrix, deceased, for the purpose of establishing in himself a title as administrator *d. b. n.* of the first testator. A judgment confessed by an executor, or other admission or act of the executor, is not evidence for the creditor against the heir at law. *Harwood vs. Rawlings*, 4 *H. & J.*, 126. And the executor cannot rely on his account passed before the orphans court as evidence of an over-payment of the personal estate. *Collinson vs. Owens*, 6 *G. & J.*, 4. These cases settle the question. The evidence, in effect, is the confession of the administrator. It is produced to charge the real assets in favor of the party by whom the evidence has been fabricated.

But it is insisted, that these objections are inadmissible, because of our failure to file exceptions to the auditor's report in the form prescribed by the act of 1825, ch. 117. The case of *Davis vs. Leab*, 2 *G. & J.*, 303, decides, that an appeal will not lie from the refusal of the county court to instruct the jury, that the plaintiff on all the evidence is not entitled to recover. But it is just as clearly settled, that where the testimony offered is all on the part of the plaintiff, and is not sufficient in law to entitle him to a verdict, the court may and ought to instruct the jury, "that the evidence offered is not sufficient to entitle the plaintiff to recover." *Cole vs. Hebb*, 7 *G. & J.*, 28. In this case all the evidence is on the part of the claimant. And the fifth exception is, *that the proof* upon which the auditor has allowed the claim, *is insufficient in point of law.* Conceding then the applicability of the cases at law adjudged upon the second, to cases in equity arising upon the first section of this act of 1825, we insist that our exception is sufficiently explicit for all the purposes of our argument. But in truth the rule in equity has been always more liberal. The necessity for *any exception* is created by the act of 1825. *Maccubbin vs. Cromwell*, 2 *H. & G.*, 450. *Ringgold vs. Ringgold*, 1 *H. & G.*, 67. Where the question is fully presented

by the pleadings, it need not also be raised by exceptions. *Beall vs. Wells*, 2 G. & J., 458. In equity the court looks only to the true nature of the exception, disregarding imperfection in form. *Post vs. Mackall*, 3 *Bland*, 498. And in practice we know that exceptions even more general than this are tolerated. *Strike vs. McDonald*, 2 *H. & G.*, 213, which was prior to the act of 1825; and *Taney vs. Diggs*, *Robert W. Bowie's estate*, *Notley Young's estate*, and others, in which general exceptions have been filed and allowed.

Upon these authorities we insist, that the objection to the title of complainant, as administrator *d. b. n.*, to sue for the balance in hand of the executor at the time of her death, being apparent in the pleadings, is now open for discussion, and that our fifth exception is sufficiently broad to enable us to take advantage of the failure of complainant to prove the insufficiency of personal estate, and of all other defects in evidence essential to his case.

We propose, in conclusion, briefly to discuss the question, whether Mrs. Richardson died seized in fee of the lands sold under the decree? The case of *Matthews vs. Ward*, 10 G. & J., 444, fully sustains the position, that a deed which contains words operative for the purpose, will be treated as a feoffment, or a bargain and sale, as will best advance the intention of the parties. In the opinion delivered in that case it is observed, that the words "bargain and sell," in conveyances by lease and release, were inserted among the operative words of that conveyance, that the lease *might be treated* as a bargain and sale, and not a lease at common law. But it would be inconsistent with the entire scope of the opinion to suppose, that the expression "bargain and sell," was to be conclusive of the question. The language imports nothing more, than that the conveyances in England incorporate in the lease the operative words of a conveyance at common law, and the operative words of a conveyance under the statute of uses, to the end that if it should fail to operate in one way, it may have effect in another. And when it is considered that the lease and release is the most usual assurance in England, and

that delivery of possession is essential to the lease at common law, we shall readily appreciate the tendency of English conveyancers to use terms, which may make the conveyance operative by force of its language, without the aid of extrinsic evidence. In this country, however, enrollment answers the purpose of livery of seisin at common law, and is equally indispensable to the validity of a conveyance at common law, and of a conveyance under the statute. With us, therefore, if the deed contains words operative at common law, and other words operative under the statute, we should respect only the intention of the parties, in determining whether the deed shall operate in one way or in another.

The construction given to the statute of uses is too firmly rooted at this time to be disturbed. But it has defeated in a great degree the object of its framers, and the tendency of modern times is to treat the use as executed, wherever it can be without defeating the intent of the parties, or disturbing some adjudged rule. In the construction of wills particularly, the intent of the testator is mainly respected. And the use is executed or otherwise, and wholly or partially, as may best advance the objects of the will. If the limitations in this deed were in a will, we should experience little difficulty in affirming, that the use was executed in the trustee during the lifetime of the *feme covert*, and became executed in her heirs immediately on her death.

We rely on the case of *Matthews vs. Ward*, as showing the strong inclination of courts in modern times to consult the intention of the grantor, even in the construction of deeds. The intent of the parties to that deed clearly was, that it should have effect under the statute of uses. All the limitations were expressed in the same language. There was no purpose to be answered by giving to the deed an operation at common law, or by giving to any one clause a construction different from the construction given to the others. In the present there is not only diversity of expression, but diversity of purpose to be considered. The purpose of the grantor evidently was to give to Mrs. Richardson, then a *feme covert*,

an estate for her life for her separate use, and to secure the inheritance after her death for her children. This purpose is to be effected, and only can be effected by executing the use in the trustee during the life of Mrs. Richardson, and after her death in her children. If the estate limited to the children is held to be an equitable estate, it would coalesce with the equitable estate for life in the wife, she would have a perfect control over the inheritance, and the husband would be entitled to a tenancy by the curtesy in the premises. Thus the intent of the grantor would be completely defeated.

*William H. Norris* for the appellee.

The first question is, whether the property is liable under any creditor's bill or proof of claim to the debts of Mrs. Richardson? The appellee insists on this liability:—1st, because the legal effect of the deed vested in Mrs. Richardson a fee-simple under the rule in *Shelley's case;* and 2ndly, because, whether that be so or not on any independent construction of the deed, such effect has been conclusively admitted by the defendants in the agreement, by consent to the final ratification of the sale made under the decree of the 26th of May 1847.

There is no dispute about the principle, that the limitation of the life estate and the remainder must be uniform in *quality* before the two can coalesce and vest a fee in the ancestor. They must both be *legal* or both be *equitable*, before the rule can apply. *Hayes, 7 Law Lib., 26, Notes and Illus., note c.* The uniform *quality* of the limitations in this deed are established, either on the theory that it is a bargain and sale or a feoffment. If it be a bargain and sale, all the beneficial estates are equitable; for in the language of Mr. Preston, "a use cannot, in the same conveyance, be declared of a seisin which is executed by force of the statute of uses, for the statute executes only the use in the first degree. Thus no use can be declared on the seisin of a bargainee or of an appointee of a use, because the appointee or the bargainee has merely a use; and the ulterior use declared of his estate is merely a use on a use, and therefore a trust, not executed

by the statute of uses. Thus, when a bargain and sale is made to A in fee, to the use of B in fee, A, the bargainee, has merely a use, and the use declared in favor of B is a use in the second degree, or merely a use on a use, and for that reason a trust." *2 Preston on Conveyancing*, 482, 483. To explain this more fully, we are to remember, that by force of a pecuniary consideration the vendor of land, prior to the statute of uses, became seized to the use of the vendee, and it was that use, so created, which the statute executed into a legal estate in the vendee. And as the statute never acted but once in the same conveyance, it unavoidably followed, that all the limitations ulterior to that of the bargainee were unexecuted, and "for that reason, trusts." *Cornish on Uses*, 3 *Law Lib.*, 28, 71, 72, 73. 2 *Black. Com.*, 335. *Jackson vs. Seelye*, 16 *Johns. Rep.*, 199. *2 Crabb Real Property*, sec. 1656. *Jackson vs. Cary*, 16 *Johns. Rep.*, 304. 1 *Saund. Rep.*, 251, note 2. *McWhorter vs. Agnew*, 6 *Paige*, 111. And *Matthews vs. Ward*, 10 G. & J., 444, where the Court of Appeals affirm the reasoning of these authorities.

An effort is therefore made to have this deed treated as a feoffment, by assuming that it was the clear intent of the grantor not to give Mrs. Richardson a fee-simple, which intention the operation of the rule in *Shelley's case* would defeat, and a feoffment subserve. Now it is insisted:—1st, that this intention is entirely suppositious; and 2nd, that there was no design to make a feoffment.

That the purpose was to give Mrs. Richardson a mere life estate can only be inferred from the limitation of the remainder to her heirs, "from and immediately after her death." To seek to evade the rule by such an argument, is a direct attack on the rule itself. "The object of the rule is to frustrate this intention as often as the word heirs embraces all the persons necessarily answering that description, as the class of persons described by that term," and "the grantor then means that which the law will not suffer him to give, or the heir to take as a *purchaser*." 1 *Preston on Estates*, 326. The authorities all recognise this, whether applied to deeds or wills. As to this

form of expressing limitations, we are bound to assume, that the grantor in a *deed* intended this constructive effect as the especial design of the conveyance. The decided import and result of such phraseology, enunciated in a long train of decisions, becomes a part of the signification, and to follow the ordinary signification of the words ought to be assumed as violating the intention, rather than subserving it. It is idle to talk about rules of property, if the rules of interpretation are not a part of them, and if they are not supposed to be known to the authors of deliberate and formal instruments for the limitation of property. But there is another reason why these terms were employed, not to bound the duration of her estate, but to negative another's right of enjoyment. The deed describes her as "the wife of Robert R. Richardson." Her conjugal condition was a fact present to the mind of the grantor and was to be provided for. The author of the instrument well knew the unvarying course of modern authorities which had established, that a limitation to the *sole and separate use* of a married woman did not arrest the operation of the rule in *Shelley's case*, but that nevertheless the remainder was annexed to and consolidated with the freehold of the ancestor; but in such manner, under this form of expression, that the estate would not be subject to the marital claims or liabilities of the husband. 2 *Jarman on Wills*, 245. 1 *Preston on Estates*, 383. 2 *Powell on Devises*, 22 *Law Lib.*, 231. *Douglas vs. Congreve*, 1 *Beavan Ch. Rep.*, 59. *Roberts vs. Dixwell*, *in Fearne on Cont. Rem.*, 56. But having negatived the conjugal claims of the husband during her life, these claims were to be further negatived, which might otherwise arise at her death. Accordingly, with the purpose of exscinding from the entire fee every claim of *curtesy*, it was provided, that "from and immediately after the death of said Elizabeth," the property should devolve upon her heirs. 2 *Spence's Eq. Jur.*, 511. *Bisset on Life Estates*, 42 *Law Lib.*, 55, 56. *Bennet vs. Davis*, 2 *Peere Wms.*, 316. *Cochran vs. O'Hern*, 4 *Watts & Sergt.*, 95. 1 *Roper on Husb. and Wife*, 31 *Law Lib.*, 22, 23. Such a mode of conveying to a married

woman a fee-simple to her separate use is not a partial, but an entire exclusion of the marital rights in the inheritance. Our own Court of Appeals has decided, that such phraseology is ample to exclude curtesy. *Ward vs. Thompson*, 6 G. & J., 357. In this deed the separate use is fastened on the property to the instant of the wife's death, and then the estate is "immediately" devolved on "her heirs and legal representatives." A mere direction to pay over the profits to her sole and separate use during her life, would not have been enough to exclude the marital claims on the *inheritance*. *Dugan vs. Gittings*, 3 *Gill*, 138. 6 *G. & J.*, 357. There is then quite another motive for the form of the limitation, than an intention only to give Mrs. Richardson a life estate.

But there are other keys of interpretation to be found in the language, which the grantor did not use, and which would readily have accomplished the intention imputed to her by the appellants. Had the remainder been limited to the children or issue of Mrs. Richardson, the rule would have been effectually excluded, and the imputed intention scientifically accomplished. 1 *Preston on Estates*, 322, 379.

2ndly. There was no design to make a feoffment. In ascertaining the intention of the grantor, it is important to fix what *form* of conveyance was designed, whether a feoffment or a deed of bargain and sale. In *Matthews vs. Ward*, 10 G. & J., 449, our highest court has met the very question in this very phase—as to the intent of the grantor to adopt the one form of conveyance or the other—and has authoritatively designated the mode in which the grantor's primary selection is to be ascertained. It is by referring to the leading order of the operative terms of transfer, and in criticising the deed then under review, it passed on the identical words of our deed. "Nothing could more unequivocally impress a distinctive character on the instrument, than the words which have been used; the terms '*bargained and sold*' follow the words 'given and granted,' and qualified the mode of the gift and grant, and show that it was by bargain and sale." 10 G. & J., 449. Another argument as to the form of convey-

66    v.3

ance designed, is the fact that a pecuniary consideration is mentioned, which is essential to a bargain and sale, and not necessary to a common law conveyance, which took effect from livery. *Cornish on Uses*, 3 *Law Lib.*, 27. A further argument as to whether a feoffment was intended, is to be found in the common sense fact that "feoffments are disused." *Cornish on Uses*, 3 *Law Lib.*, 15. And that "bargains and sales" have long been the customary assurances of this State. 10 *G. & J.*, 449. It is then submitted that no feoffment was intended.

But what becomes of the imputed intention, when it is found that a feoffment terminates in the same result, by making *all* the beneficial limitations uniform in *quality*, and only differs from a bargain and sale in transferring all *legal*, instead of all *equitable* estates? A feoffment, it is argued, would execute a *legal* estate in the heirs of Mrs. Richardson. So it would; but why not also a *legal* estate in Mrs. Richardson herself? Because it is said that there is in this deed "diversity of expression" in connection with the two estates; that is, the estate is conveyed "*in trust*" for Mrs. Richardson, and "*to and for the use and benefit*" of her heirs." The argument assumes that there is not a mere "diversity of expression," but a diversity in legal effect of the expressions. What is there in the words "use and benefit," to imply that the grantor intended that the legal estate should be executed in the heirs? Nothing *but their effect under the law of the statute of uses.* But that law does not say that the estate shall be executed only in the feoffee of the "use or benefit." It executes the estate in the feoffee "of the use, *confidence* or trust." And it has always been held, that "the statute makes no difference between a use and a trust, but mentions both promiscuously." 2 *Crabb on Real Property*, 55 *Law Lib.*, 295, *sec.* 1629. Even in the interpretation of wills, "the fact that the testator, in a series of limitations, employs sometimes the word *use* and sometimes the word *trust*, is not considered to indicate that he had a different intention in the respective cases." 2 *Jarman on Wills*, 199.

But it may be argued, that the life estate of Mrs. Richard-

son is clothed with a trust to her *sole and separate use*, and therefore is necessarily equitable, and the legal estate necessarily detained in the trustee. It is true, that in the vast mass of cases the legal estate is lodged in the feoffee, and the use or trust is not executed, because of some special duties to be performed by the trustee, and of the consequent necessity of an estate commensurate to those duties. As where the estate is limited to one "to receive the rents and profits for," or "to pay them over to, another," "or to make leases," "or to repair," or to do any other fiduciary services. But the distinction is equally well settled, that when the trustee has no duties to perform, as when an estate is given "to one person upon trust to permit and suffer another person to receive the rents, the beneficial devisee takes the *legal* estate and not the trustee." 2 *Jarman on Wills*, 201, 202. In this deed there is the strongest negation of any special trusts in the trustee. If a *bargain and sale*, he is the mere holder of the dry legal title. If a feoffment, he has nothing to do to retain the smallest iota of the legal title. What then is to prevent the transfer of the use or trust under the statute? It may be said that it is necessary to arrest the transfer in order to exclude the marital rights. But this is a mistake, justified, it is admitted, by the enunciation nearly of this doctrine by several able elementary writers in their servile copyism from each other, or their inaccurate deductions from the authorities. All these authorities are on wills, and none of them in which the trustee was not either "to receive the rents and profits," or, "to pay them over to her," or in which the married woman's "receipt to the trustee was to be a good discharge," thus implying that he was to receive and pay them over. From inattention to these important circumstances connected with the limitation, some of these authors have carelessly stated that the legal estate is in the trustee, when the property is clothed with a trust for the separate use of a married woman. *Lewin on Trusts*, 24 *Law Lib.*, 53. A trust for a *feme covert* was a mere creation of a court of equity, and by its power alone prevented from being a *void condition*, just

like an absolute restraint on alienation. 1 *Spence Eq. Jur.*, 596. *Tullett vs. Armstrong*, 1 *Bevan*, 22. But no one ever thought that a condition, good or void, prevented the translation of the estate under the statute. And what is this *separate use*, but a condition as to the enjoyment of the usufruct, and negativing merely the right of appropriation of the profits by a party not intended to be benefited by the grantor or devisor.

The authorities affirm the proposition, that a trust for a married woman does not prevent the operation of the rule in *Shelley's case*, when the limitations carry the legal estate to the taker for life and the remainder-man. Why? Because "trust estates are not objects of the jurisdiction of courts of law." 2 *Powell on Devises*, 22 *Law Lib.*, 231. 2 *Jarman on Wills*, 245. If when the devise or grant is *direct* to a married woman, a separate use will not prevent the operation of the *Shelley rule*, because of the reason given, how can it be that a separate use in itself can prevent the operation of the statute of uses? When the estate is directly given, it is not prevented from being a *legal* estate; but the marital right of the husband is denied and debarred by the court of equity. The husband is considered as her trustee; that is to say, he *takes* in trust for her. And he does the same, when the devise or grant is to another for the benefit of the wife, and there is nothing to prevent the action of the statute of uses *but* the separate use. Both these propositions are sustained in two modern cases, *Douglass vs. Congreve*, 1 *Beavan*, 59, 72, and *Williams vs. Waters*, 14 *Mees. and Wels.*, 166.

In the case of *Harton vs. Harton*, 7 *Term Rep.*, 648, the receipt of the wife was to be a sufficient discharge to the trustees. And *Doe vs. Barthrop*, 5 *Taunt.*, 382, was a devise in trust "to permit to enjoy the same, *or to pay to*, or to permit and suffer her to receive the rents during her life, for her separate use," clearly implying some active function in the trustee. But in the case at bar there is nothing of the kind, and besides, the instrument is a *deed* and not a *will*. 2 *Bright on Husband and Wife*, 219. It is submitted, therefore, that in a *deed* the mere trust for the separate use of a

*feme covert* will not detain the legal estate in the feoffee; and there is no case to be found, even of a will, where the use was not executed, unless where there was some active function to be discharged by the trustee. Thus treating the conveyance as a feoffment, only brings about a uniformity of *legal* estates, and the rule in *Shelley's case* executes the fee-simple in Mrs. Richardson.

But independently of any construction of the deed, the liability of the property, as the estate of Mrs. Richardson, has been conclusively conceded by the unrestricted ratification, by *consent*, of the sale of the property under the decree. This consent ratification was on the 12th of October 1847. But in a subsequent part of the argument, both the conclusiveness of the decree and the extent to which it is conclusive will be discussed. I come now to those questions which bear upon the creditorial claims and the mode in which they have been asserted. First, what questions are open on this appeal? The appellants contend that it opens for revision all the previous decrees and orders in the cause.

The points are:—1st. What was the nature of the decree, was it final or interlocutory? What points did it conclude and establish? 2nd. Would that decree be reviewable under the appeal in this cause from the order overruling the exceptions to, and finally ratifying the auditor's report? 3rd. What was the effect upon that decree of the ratification of the sale by consent? 1st, the administrator of the decedent was a complainant in his individual right, and as administrator *d. b. n.* of his father. It is true the law ordinarily requires the executor or administrator to be made a party in a proceeding to sell the decedent's real estate. *Tyler vs. Bowie*, 4 *H. & J.*, 334. *David vs. Grahame*, 2 *H. & G.*, 97. But here, in his capacity of administrator, he could not be made a party defendant, as he could not occupy both sides of the docket. *Birely and Holtz, vs. Staley*, 5 *G. & J.*, 454. *State, use of Stevenson, vs. Reigart*, 1 *Gill*, 3. He was the proper representative of the personalty, and knowing its condition charged in the bill, its exhaustion, and outstanding debts unpaid.

Here was the admission of the administrator by the charge made by him in another capacity. But this admission is to be construed in connection with the further allegation, that the complainant had called on the defendants to allow the real estate in question to be sold for the payment of Mrs. Richardson's debts, under the necessary implication that her personalty was exhausted, and in connection with the answer of the defendants as to these matters. The orphans court account is not the only admissible evidence that the personalty was exhausted. · On the contrary, this fact may be admitted by the opposite party. *Wyse vs. Smith and Buchanan*, 4 *G. & J.*, 302. *Griffith vs. Frederick County Bank*, 6 *G. & J.*, 445. When, therefore, they admit the application of the administrator to sell this property to pay the *creditors* of Mrs. Richardson, and allege their refusal only on the ground that they deny the liability of the property as her *estate*, is not the exhaustion of the personalty a fairly inferrible admission? Does it not amount to this, we agree to pay *the* debt which was admitted to be due, if the property was her estate? *Assuming* this view to be correct, what was the nature of the decree? Was it final or interlocutory?

This is a *creditor's* bill; a proceeding *in rem*. *Tongue vs. Morton*, 6 *H. & J.*, 23. *Griffith and Keys, vs. Reigart*, 6 *Gill*, 453. The decree establishes, not only for the complainant, but all other creditors who may prefer claims against the property, the fact of the condition of the personalty. Hence it is a *final* decree, though there may be other decrees or orders afterwards passed in the *cause* in relation to the distribution of the proceeds. The decree "*definitively adjusts*" the right to go against the property. *Gibson vs. McCormick*, 10 *G. & J.*, 105, 113. 6 *Gill*, 453. *Graham vs. Hardin*, 4 *Dana*, 559. *Alexander's Ch. Pr.*, 144. But suppose the decree was given without sufficient proof of this fact, then the court did not comply with the requisitions of the act of 1785 before it exercised jurisdiction, just as if it had passed a final decree for the sale of an infant's land, without evidence that the sale "would be for the benefit and advantage" of the infant, "without which being made to appear

to the court, *it possessed no power to decree a sale.*" *Harris vs. Harris*, 6 *G. & J.*, 114. And yet when a decree thus made comes collaterally in question, it is just as conclusive and binding as if founded on the most competent and sufficient testimony, if the bill makes the proper allegations. *Tomlinson vs. M'Kaig*, 5 *Gill*, 274. *House vs. Wiles*, 12 *G. & J.*, 338. Because "it is not the proof which gives jurisdiction, but the subject matter of the bill, and nature and character of the claim." *Comegys vs. State, use of Dyckes*, 10 *G. & J.*, 183. If it conforms to the allegations of the bill, any unauthorised exercise of power in the decree for want of proper proof to sustain it, is merely matter for its reversal on appeal. *Tomlinson vs. M'Kaig*, 5 *Gill*, 276, 277. Accordingly it has always been held that a decree stands for what it purports to be, until it is regularly reversed or revised. *Estep vs. Watkins*, 1 *Bland*, 486. Such a *final* decree, if not appealed from within the proper time, becomes the law of the case in the further progress of the cause. *Strike vs. McDonald*, 2 *H. & G.*, 191, 260. Even *decretal orders had this* effect before the act of 1830, ch. 185, under the act of 1785, ch. 72, sec. 27. 2 *H. & G.*, 260. The distinction between which and decrees is, that the latter are the "orders of the court made upon the *hearing*. A decretal order is an order in the nature of a decree, made upon *motion* or *petition*, either *before* or *after* the hearing." 1 *Barbour's Ch. Pr.*, 337.

The point, that the insufficiency of the personalty was not established, assumes, that both the solicitors and the court did not know that proof of the exhaustion of the personalty was a necessary preliminary to a decree for a sale under a creditor's bill, and that if the facts stated in the bill are not sufficient to entitle complainant to the relief prayed, he cannot resort to the answer. *West vs. Hall*, 3 *H. & J.*, 221. And that a bill for one purpose cannot be made to answer quite a different one, and that every decree must be on the allegations of the *bill*. *Chalmers vs. Chambers*, 6 *H. & J.*, 29. *Chambers vs. Chalmers*, 4 *G. & J.*, 420. *Ringgold vs. Ringgold*, 1 *H. & G.*, 11. Certainly the court never intended to

make a sale to a purchaser without authority and without any bill.

But it follows also that the construction of the deed was decided on by the decree, because that property was ordered to be sold under the prayer of the bill; to treat it as a sale for the purpose of *partition*, would be to sell property without any bill to give the court jurisdiction. *Tomlinson vs. McKaig,* 5 *Gill,* 274. Such a fraud on a purchaser will never be imputed to an inferior court; nor such folly. On a creditor's bill to sell the property of A, it is as necessary *to the jurisdiction of the court* that it should be satisfied before decree that A "did leave real estate," as that he *did not* leave personal estate sufficient to discharge the debts due. But that decree established also the title of the appellant to sue in the capacity in which he did sue. That was an element of the claim, and had to be decided anterior to the decree. No one can look at the court's opinion ratifying the auditor's report years afterwards, without seeing that this title to sue was *meant* to be affirmed.

Having shown that this is a *final* decree *in rem,* the second inquiry is, whether, by force of the act of 1830, ch. 185, the appeal from the order ratifying the auditor's report, opens the decree? It is said this act deprived the party aggrieved of his right to an appeal from a decree directing a sale of real or personal property, and *Hatton vs. Weems,* 10 *G. & J.,* 377; *Lee vs. Pindle,* 11 *G. & J.,* 362, and *Hatton vs. Weems,* 12 *G. & J.,* 83, are cited as authorities for this proposition. But they do not sustain it. They establish that a mere decree for the sale, or delivery of personal or real property, is not in *all* cases a *final* decree, and that such a decree was not a *final* one in *those* cases. They were not decrees on a *creditor's* bill, and it has never been contended that in all cases a decree for the sale of property is a *final* decree. In all cases the decree is not one *in rem.* By the very language of the act of 1830, it was only appeals on *interlocutory* decrees for the sale of real or personal property which were prohibited. It did not disturb the law as to appeals from "a final decree, or,

order in the nature of a final decree. These were *expressly* excepted, and left under the previous law requiring an appeal within nine months from their rendition. The act of 1841, ch. 11, has nothing to do with *final* decrees or orders in the nature of a final decree, but is restricted to "*so much* of the first section of the act" of 1830, as takes away the right of immediate appeal from decrees or orders *not* final, nor in the nature of a final decree. As to these, the *right* of immediate appeal is given, and the case of *Dugan vs. Gittings*, 3 *Gill*, 138, merely decided, that these were not by the grant of this right reinstated under the law of 1785, ch. 72, but that the party had left an *election* to be governed by the law of 1830, and wait till a final decree. Before the appellants can avail themselves of that act, they must show that this decree was one on which the act of 1830 suspended an appeal, that is, that it was not "a final decree or order in the nature" of one. When that is done, every decision on creditor's bills declaring them decrees *in rem*, will be reversed. 6 *Gill*, 448, 449, 453. But, additionally, such a construction would repeal the act of 1729, ch. 3, sec. 3, and the act of 1713, ch. 4, secs. 4 and 5; for by these it is required, that on an appeal there should be a *motion* for an appeal in equity causes. *Thompson vs. M'Kim*, 6 *H. & J.*, 329, 330. Here there was only a prayer for an appeal from the order of the 16th of November 1849. The frightful consequences which any other construction of these acts would effect, will present themselves to any one who will think of an appeal from an auditor's report, after stating and restating accounts among litigant creditors for many years, as opening the original decree under which property has been sold, and after many of the parties have been paid off, and possibly upon some dispute between parties coming in subsequently to the filing of the bill.

The next question is the confirmatory effect of the final ratification of the sale. This was by the unqualified consent of the solicitors for the respective parties to the cause and for the purchasers. This confirmation of its proceeding implies the admission of every necessary fact to sustain the decree.

The decree under which the sale was made, is as much rati-
fied as the sale itself. It is on the principle that every thing
is admitted to have been rightly done that the law precludes
parties from appealing from any decree given by consent.
*Porter vs. Askew,* 11 *G. & J.,* 346. 1 *Barbour's Ch. Pr.,*
373. *Armstrong vs. Cooper,* 11 *Illinois,* 540. *Kennedy vs.
Georgia State Bank,* 8 *Howard,* 612, 613. Will it be con-
tended, that the act of 1841 opened what the parties had
agreed not to appeal from? We have now done with the de-
cree of the 26th of May 1847. It is an irreviewable finality.

We are now to consider the subsequent proceedings. As
to these, whatever has been settled by the judgment *in rem,*
is no longer open. This brings us to the proofs of the claims
and the exceptions levelled against them.

It is evident that complainant's claim has been enlarged,
and for the excess over the claim admitted by the answer it
is conceded, that the decree has no bearing, except by virtue
of its qualities *in rem,* as deciding the *facts* of the insufficiency
of the personalty and the liability of the property to creditors.
These facts are established as against the defendants in the
bill for the benefit of all the world. As no other creditor has
to prove these points anew, so neither has the complainant.
It is further conceded, that prior to the act of 1832, ch. 302,
sec. 5, such an enlargement of claim had been disallowed.
*Strike vs. McDonald,* 2 *H. & G.,* 191, *per Bland, Ch.* But
why? Because, unlike other creditors who come in after-
wards, the complainant's claim was a part of the pleadings,
and the principle was fixed, that a court of equity must always
decree upon the allegations in the bill, and cannot go beyond
them; the *allegation and probation* must agree. *Ringgold vs.
Ringgold,* 1 *H. & G.,* 11. *Chalmers vs. Chambers,* 6 *H. &
J.,* 29. The objection is to the sufficiency of the averments
to cover the amount allowed by the auditor. There is *no* ex-
ception taken under the act of 1832 to sustain this point. It
is needless to refer to but one of the numerous decisions on
the act, *Berrett vs. Oliver,* 7 *G. & J.,* 201. The claim then
is not open to any objection from the state of the pleadings,

by force of this act. It has to be established as to the excess in the same manner as any other claim, and can be objected to in no other way.

But *assuming* that the appellants have made fit exceptions to raise their points, let us consider the point as to the capacity of the complainant to sue as administrator *d. b. n.* of his father. Two objections are taken:—first, that the act of 1820 is not sufficiently comprehensive to devolve the proceeds of the negroes on the administrator *d. b. n.*; secondly, that if it was the order of the orphans court directing their delivery to such administrator, was an indispensable preliminary to vest title in him and enable him to sue. The first insists, that the "money" referred to in the act of 1820, is "money having an ear-mark, whereby it may be identified as assets, or as the representative of assets." The power conferred on an administrator *d. b. n.* by the act of 1798, ch. 101, sub-ch. 14, sec. 2, was "to administer all things herein described as assets, not converted into money, and not distributed or delivered, or retained by the former executor or administrator under the court's direction." To extend both the power and responsibility of such administrator, the act of 1820 authorised the court to order the executor of the deceased executor to deliver over to the "administrator *d. b. n.* all the bonds, &c., which the deceased executor may have taken, received or had, as executor at the time of his death, and also to pay over to the said administrator *d. b. n.* all the money in the hands of such deceased executor, as such, at the time of his death." It is plain this act contemplated that the deceased executor might have sold some of the property, and taken a note, account or evidence of debt, as its representative, and this was to be delivered over. So if the negroes had not been paid for in the lifetime of Mrs. Richardson, there could be no doubt that the administrator *d. b. n.* could, under this act, demand and receive the evidence of debt taken therefor. And it is admitted, that it would be the same if the money—the *very* dollars— received by the executrix for this property were specifically on hand and "ear-marked." Now the authorities say that

"money has no ear-mark;" could it therefore have been the purpose of the act of 1820, which was intended to enlarge the act of 1798, to intend merely such money as was "ear-marked" and traceable, as the identical money received by the deceased functionary? It is said that this construction has been given to the act by the case of *Sibley vs. Williams*, 3 *G. & J.*, 52. But an examination of the case entirely refutes it. There the property had been consumed and wasted. The *nar* did not declare that the property had been sold and converted into money; and the court carefully discriminate it from the case at bar, by saying further, "where property which *has not been converted into money*, and for which no evidence of debt has been taken, but has been wasted and destroyed, there is no remedy but by a resort to the estate of the delinquent executor or administrator." Whilst the act of 1798 debarred the administrator *d. b. n.* from administration of assets, "not converted into money," the act of 1820 was meant to embrace all cases in which the property *had* been converted into money. That this is the true construction, is seen by the sixth section of the latter act, where what is obtained or to be obtained by the administrator *d. b. n.*, is spoken of as "the DAMAGES to be recovered as aforesaid by the administrator *d. b. n.*" Now what *damages* are these? *Sibley and Williams* decides, that they are not for the property actually and not technically wasted. It is very evident, the term was intended to comprehend the value of all the personal property which had been converted into money, as well as the notes, accounts and evidences of debt, whether such money were "ear-marked or not." Specific assets merely could not be called "damages," but, on the other hand, as property actually wasted, could neither be called money, nor specifics, nor notes, accounts or evidences of debt, the court was obliged to give the decision it did in *Sibley and Williams*, and say that as to such property the pre-existing law of 1798 had not been altered. But they never said that the money into which property had been converted must be ear-marked, to support an application under the act of 1820 for its delivery. At that

time, the personalty of a decedent could be sold by his executor or administrator just as his own, in cases free of collusion. *Allender vs. Riston*, 2 *G. & J.*, 86. Here it was not competent for the administrator *d. b. n.* to sue the administrator of Mrs. Richardson, as the same person filled both capacities, and as this condition left him remediless at law, he was compelled to proceed in equity against the realty of the decedent whom he represented. *Birely and Holtz, vs. Staley*, 5 *G. & J.*, 454. *Stevenson vs. Reigart*, 1 *Gill*, 3. *Brooks vs. Belt*, 12 *G. & J.*, 307, 318.

These authorities dispose of the second objection, that the administrator *d. d. n.* was not entitled to recover without a preliminary order of the orphans court. He could procure no such order in one capacity against himself in another; for though the capacities are distinct, the same person cannot proceed in the one against himself in the other. Therefore, what is indispensable in another class of cases is not required in this, and is a useless ceremony.

It is an obvious error to say, that an account passed by the administrator of a deceased executrix from the books and papers left by her, in pursuance of the act of 1816, ch. 203, sec. 3, is to be treated as *his* account, and that it "violates justice and the rules of evidence, to permit him to avail himself of his character of administrator of the executrix, deceased, for the purpose of establishing in himself a title as administrator *d. b. n.* of the first testator." It is not *his* account but *hers*. It is her admission. And such accounts are *prima facie* evidence in every species of suit into which they enter. The account was not passed "by the administrator of the executrix" as his, but as hers from the *books and papers left by her*.

So far the argument has proceeded on the basis, that fit exceptions have been taken to the proof. But the final point is, that the objections raised are not grounded on legal and competent exceptions, without which they are waived. The object of the act of 1825, ch. 117, was to make the Court of Appeals literally an appellate court, on the cases within its

provisions; that as to these, the points presented below should be alone considered in the court of review.    The first section is exclusively applicable to common law cases; the second to chancery causes, and *only to certain decrees of them.*    But it has been decided, that the *purpose* of the act was the same in both sections.    *Boteler and Belt vs. Brookes,* 7  *G. & J.,* 156.    *Miller vs. Allison,* 8  *G. & J.,* 37.    A proper insight into the intended operation of the second section of this act, will be best obtained by finding the state of the law as to decrees on auditors' accounts prior to its passage.    This is stated in *Ringgold vs. Ringgold,* 1  *H. & G.,* 67, by *C. J. Buchanan:* "Very soon after the constitution of the present court, it was decided that the auditor's report, to which there had been general exceptions, or where there had been special exceptions, or where there had been no exceptions taken to it in the court below, might be excepted to in this court, and the whole account gone into."    It was the purpose of the act to reform this practice from the experience of its evils. It is very apparent then, that a general exception is not intended by the act, for it would accomplish none of the proposed reforms.    In all authorities, general exceptions have been treated as no exceptions at all.    *Alexander's Ch. Pr.,* 127.    1 *H. & J.,* 747, '8.    *Dexter vs. Arnold,* 2 *Sumner,* 125. *Flower vs. Hartop,* 6 *Beavan,* 476.    Proper exceptions had always been deemed in the nature of *special demurrers,* and must point to some particular error.    *Wilkes vs. Rogers,* 6 *Johns. Rep.,* 566.    *Story vs. Livingston,* 13 *Peters,* 366.    2 *Danl. Ch. Pr.,* 1490, 1497.    The case of *Wells vs. Beall,* 2 *G. & J.,* 467, was similar to *Miller and Allison,* 8 *G. & J.,* 37, in which the appeal was not from the auditor's report and account, and the decree on it, but from the decree on the case made in the bill, proof and pleadings, independently of the matters submitted to the auditor.    The appeal had been prayed from this decree and taken in time.    The decision was, that a *seasonable* appeal opened to appellant all the points presented by the pleadings; and that if his pleadings put in issue the title of the complainant, such point was not waived by the

character of his exceptions to the auditor's report. It only affirmed, that the act of 1825 did not apply to all decrees, but was limited to those on auditors' reports; nor did it preclude a party from appealing from the other decrees, because it chanced that an auditor's report had been made in them. This would have extended the act beyond its purpose. 8 *G. & J.*, 37, 38.

A few authorities will suffice as illustrations from the first section of the act of 1825, of the manner in which the point is to be presented to the inferior court, and what prayers in courts of law are too general, and serve at the same time to explain the case of *Cole vs. Hebb*, 7 *G. & J.*, 28, and show that it was not intended in that case to decide the point, that a prayer "that the evidence offered is not sufficient to entitle the plaintiff to recover," was good under the act. In *Wheeler vs. The State, use of Bateman*, 7 *Gill*, 343, the evidence was all on the part of the plaintiff, and it was held that a prayer "that the plaintiff was not entitled to recover," was too general since the act of 1825; and the same judge who delivered the opinion in *Cole vs. Hebb* says, "so uniform and consistent have been the adjudications of this court since the passage of the act of 1825, that for a county court's refusing to grant such a prayer, its judgment cannot be reversed on appeal to this court, that we do not deem it necessary to give the names of the cases in which such adjudications have been made." See also *Leopard vs. Ches. and Ohio Canal Co.*, 1 *Gill*, 228, 229. *Duvall vs. Cook*, 9 *Gill*, 460. *Bayne vs. Suit*, 1 *Md. Rep.*, 81, 86. But we have additional guides as to the definiteness required in exceptions, in the decisions on the act of 1832, ch. 302, sec. 5. The act of 1825 had not required, as to other decrees than those on auditors' accounts, any exceptions to the competency or admissibility of testimony. But by the act of 1832, such objections in all cases were obliged to be made by "exceptions filed in the cause." Now what construction has been put on the term "exception" in this act? The Court of Appeals have said, "nor would a general exception in the court below to the competency of

the appellant's witnesses, and the admissibility of his evidence, better their condition.     To render such exception available, it must be sufficiently definite to apprise the opposite party of the particular witnesses *or evidence designed to be excepted to.*"     *Berrett vs. Oliver,* 7 *G. & J.,* 202.     Why is not the same definite kind of exception to be required under the act of 1825?     Both acts use the same term, and have the same object in view as respects their different subject matters. The court, in *Berrett and Oliver,* evidently meant to give the term its scientific description, as being "in the nature of a *special* demurrer," and not to adopt the loose ideas and practice which prevailed with some lawyers in some of the old cases.     *Ringgold vs. Ringgold,* 1 *H. & G.,* 76.     A further illustration is seen in the case of *Bullitt vs. Musgrave,* 3 *Gill,* 47, 48, where a commission was not objected to generally, but to all such parts as went to establish a particular fact; its liability to that specific objection was regarded as the only point presented to the court, and reviewable on appeal.

The last exception is, "5th, for that the proof upon which the auditor has allowed the claims of Richardson and Latrobe is sufficient in point of law."     There are several objections to this exception:—1st, it is too general, and is equivalent to a mere general prayer to "instruct the jury that plaintiffs are not entitled to recover."     7 *Gill,* 344.     9 *Gill,* 460. Under this exception *every* point in the cause—as to title to sue—state of the personalty—enlargement of claim—and proof of claims—is raised.     What can be more general? 2nd, it objects to the proof of the claim of *Richardson.* Now the claim of Richardson was more than admitted by the appellants themselves.     If it is said, the exceptants *meant* the claim allowed to Richardson, as administrator *d. b. n.* of Robert R. Richardson, the answer is, they should have expressed what they meant.     The auditor's account allowed Richardson two claims, in different capacities; the exception should have discriminated the one claim from the other.     In the two capacities, the claims are as distinct as if allowed to

different men. *Tilly vs. Tilly*, 2 *Bland*, 436. *Binney's case*, *Ib.*, 99. 3rd, unquestionably the claim of Latrobe is proved sufficiently, provided the fact of the insufficiency of the personalty is concluded either by the facts in the bill and answer, or by the decree, *in rem*, endorsed by the ratification by consent of the sale under it. If so, then as this exception is entire, if any part of it is wrong, the court are entitled to overrule it. *Budd vs. Brooke*, 3 *Gill*, 220.

I have thus concluded the discussion of this case. The character of the points have an important *practical* bearing upon the true interests of litigants, the security of titles and the explicitness which the law of 1825 intended to effect for the just, speedy and unvexatious administration of law. If I have successfully argued it so as at least to narrow it down to the construction of the deed, that has been done which the parties evidently designed. And certainly there can be no just complaint that the law has accomplished the wishes of these parties and of their respective solicitors.

*T. Yates Walsh* for the appellant, in reply.

Mr. Preston, in the language quoted by the appellee, does not mean to say that two different estates, one equitable and one legal, may not be created in the same instrument. Indeed the authorities fully show that estates of different characters may be transferred by the same deed. Preston merely declares, "that a use *cannot* be limited on a use." A particular estate may be originated with a special trust, and a remainder over in legal fee. Indeed when you attempt to limit a use upon a use in terms, you do make one estate legal and the other equitable. There is no difficulty in regarding the deed as a feoffment for one purpose, and a bargain and sale in reference to another. The court is familiar with the cases in which papers have been regarded as sub-leases, and, at the same time, assignments. Chancery will protect trusts, and the courts of common law will regard that protection. *Cornish on Uses*, 3 *Law Lib.*, 25. Even considering the deed as a feoffment, its influence would be stopped by the curtesy of the common law, for the benefit of

a married woman, but not for any thing that is useless.  *Cornish on Uses*, 3 *Law Lib.*, 34.  The whole current of modern decisions protects the estate of a *feme covert*, when, by the terms of the grant, it is free from all control of her husband. The learned counsel pressed by the force of the language in the grant, for the benefit of Mrs. Richardson, "shall and may during her life, * * * * and immediately after the death," &c., seeks to regard this phraseology, as establishing a protection of the ultimate estate from the claim of curtesy.  It is respectfully suggested that this cannot be so.  For if the language of the grant for the use of Mrs. Richardson, gave her the *entire* fee, no language in reference to the remainder *over* could possibly qualify the previous estate or any of its incidents.  The doctrine in Maryland is, that deeds are to be construed according to their obvious intent, if there is nothing in that intent contravening the positive policy of the law.  That is the language of *Matthews vs. Ward*, as well as of many earlier cases.  See *Cheney's Lessee vs. Watkins*, 1 *H. & J.*, 527; *Paca vs. Forwood*, 2 *H. & McH.*, 175.  Why strain a point in order to decide, that the language of the deed in question was to exclude curtesy, when it is broad *enough* to *create* a legal fee-simple in *remainder*?

The case, upon this point, requires no aid from authorities. No construction of context, fairly given, can alter the obvious import of the terms of the conveyance.  The grantor marked out three separate estates with perfect precision.  The estate to Mrs. Kennedy, and from and immediately after her decease, then upon *this* further trust, that the said Elizabeth Richardson shall and may, &c., and from and immediately after the death of the said Elizabeth, then for the use and benefit of the legal heirs of the said Elizabeth.  It is manifest there was but one trust coupled with the grant to Mrs. Richardson, and it is apparent, that what the grantor intended as another estate, comes afterwards, and is not coupled with any trust.  When the conveyancer describes the other and third estate, he drops the words, "in further trust;" when he meant them to apply to the particular estate, he applies them; when he comes to the estate in remainder, he drops them; will the court drag them

from their context, and fix them, when he has not sought to do so. The reason given by the learned judge below, for the opinion, that an equitable estate in fee, vested, by the terms of the deed, in Mrs. Richardson, is, that the trustee by the *habendum* had taken the legal fee. Admitting that he took such an estate, it does not alter the question. His estate had to nourish two estates for life; and if he had taken merely a limited interest, it might have been exhausted before the purposes of the trust were gratified.

The decree of the 27th of May, was not in any respect based upon a creditor's bill. The sale is ordered by consent of *parties*, who agree in writing, that the interest of all concerned required a sale. The sale was because, in fact, the property was not susceptible of division. The whole proceedings, until the period of the auditor's account, were not of an adverse character. All questions relating to the bill as a creditor's bill, and all creditors' claims were expressly postponed. The proceeding became, for the first time, one for the recovering of alleged creditors' claims, when the auditor stated his account. There has been no surrender of any right on the part of the appellants. They surrender nothing by submission to the decree mentioned. It would be alarming to hold, that an agreement for a sale works a forfeiture of every right. But conceding, *argumenti gratia*, that the proposition of the appellee is true, is it not certain that the submission held him to the averments of his bill? If it be a matter of agreement by *consent*, where, without consent, does he get the authority to extend both the margin and character of his claim?

Had the complainant a right to sue any where, at the period of the inception of these proceedings? It is urged, that all the requirements of the law are to be set aside, because he chooses to assume two different characters adverse to each other; which is nothing more than to say that the law is to bend to his desires and objects. Numerous decisions establish the necessity of making the executor or administrator, a party in all proceedings, to affect the real estate of an intestate or testator. The complainant avoids all this, and says, that his conscience is not to be purged, because *he is complainant*. Now the

rule of law is perfectly understood, that if an individual vol-untarily puts it out of his power to comply with the requi-sitions of the public code, his failure to do so does not enti-tle him to exemption from its behests.   As executor of his mother, he has charge of all her vouchers; and as admin-istrator *d. b. n.* of his father, he brings her in debt.   And it is earnestly argued, that all his statements are to be re-ceived as truth.   The answer is very obvious, that having assumed voluntarily the double character of representative of the estate suing, and the representative of the estate sued, equity will hold him to the responsibility of making, upon his own *word*, no statement against *either*.   But did his position as executor of his mother, prevent his asking of the orphans court the preliminary order required by the act of 1820?   It is sub-mitted it did not.   It did not, and could not prevent the action of the orphans court, in ordering the transmission of assets from his hands, in one character, to his hands in the other.   By the provisions of that act, suit upon the bond of the delinquent ex-ecutor is only to be instituted by order of the orphans court. By the third section, the order to sue can only be given in the event of an executor refusing to deliver bonds, &c., to the ad-ministrator *d. b. n.*, so that it manifestly appears, that none of the preliminaries of the act of 1820 have been followed.   And even if they had, and the executors had been recusant, the on-ly remedy would have been a suit upon the bond, and that under the order of the court.   It would hardly be pretended, that even *under* such circumstances, a proceeding in equity to sell the estate of a deceased executor, could be made to take the place of the course marked out by the statute.   It is abun-dantly clear, that the individual creditors of Mrs. Richardson had a right to sue.   An ample remedy is thus provided for the recovery of every debt.   There is then no necessity for the law seeking to allow two inconsistent positions in one person.   To allow complainant to make out a case on both sides, the learned counsel has argued the question of *jurisdiction* instead of that of title.   *Want* of title need never be made the sub-ject of an exception.   A party must maintain it at every step of his cause.   He is bound to know that he has no standing in

court.   Upon the point of title, see 1 *Md. Rep.*, 197, *Beale vs. Hilliary*, where the distinction between title and jurisdiction is clearly drawn.

Mason, J., delivered the opinion of this court.

This case has been argued most elaborately and with distinguished ability.   Every suggestion appears to have been made and every authority invoked calculated to elucidate the intricate questions involved in the present controversy.   With the benefit of all this light, we are constrained nevertheless to recognize the difficulties which environ the case.

In order to a proper understanding of the case, we deem it important to state somewhat at length the allegations of the bill, and the subsequent proceedings thereon.

The appellee, Charles Richardson, filed his bill of complaint in Baltimore county court, as a court of equity, against the appellants, asking for a sale of the real estate of Eliza Richardson, deceased, for the payment of her debts.   He claimed to be a creditor in his own right, and also as administrator *de bonis non* of Robert R. Richardson, deceased.   The bill alleges that letters testamentary were granted on the estate of the said Robert to the said Eliza Richardson, who, by virtue thereof, possessed herself of the personal estate of her testator, and partially administered the same, but died before she had returned any account of her administration.   The complainant thereupon administered upon her estate, and also upon the estate *de bonis non* of Robert Richardson.   The bill charges that Mrs. Richardson died largely indebted ; and that her personal estate was insufficient to pay her debts, and thereupon prays the sale of her real estate under the direction of the chancery court; and that the proceeds of sale may be appropriated to the payment of her debts.

The real estate which the complainant seeks to charge with the debts of Mrs. Richardson, was derived by the deed of Areanah Kennedy, executed in the year 1802, to Samuel N. Ridgely, which is set out at length in the record.   That deed is, in part, in these words:  " witnesseth, that the said Areanah Kennedy, in consideration of the natural love and affection

which she hath and beareth towards Elizabeth Richardson, wife of Robert Richardson, and in consideration of the sum of five shillings, current money, to her in hand paid by the said Samuel N. Ridgely, at or before the ensealing and delivery of these presents, the receipt whereof is hereby acknowledged, hath granted, bargained and sold, aliened, enfeoffed, released, conveyed and confirmed, and by these presents doth grant, bargain and sell, alien, enfeoff, release, convey and confirm unto the said Samuel N. Ridgely, his heirs and assigns,'' (here the property is described,) '' to have and to hold the same and every part thereof unto the said Samuel N. Ridgely, his heirs and assigns forever, in trust, nevertheless that the said Areanah Kennedy shall and may, during the time of her natural life, have, hold, use and enjoy the said piece or parcel of ground and premises, and the rents, issues and profits thereof, and the same convert to her own use and benefit, and from and immediately after her decease, then upon this further trust that the said Elizabeth Richardson shall and may during her life, have, hold, use, occupy, possess and enjoy the said piece or parcel of ground and premises, and the rents, issues, and profits thereof, and the same to convert to her own proper use and benefit, notwithstanding her coverture, and that without the let, trouble or control of her present or any future husband, or being in any manner liable or subject to the payment of his debts, as fully in every respect as if she was sole and unmarried, and from and immediately after the death of the said Elizabeth, then to and for the use and benefit of the legal heirs and representatives of the said Elizabeth, and to and for no other intent and purpose.''

The defendants in their answer insist, that under the terms of the foregoing deed, the said Eliza had but a life estate in the premises thereby conveyed, and that on her death the fee devolved upon her children and heirs, namely: the complainant and his deceased brother. The first question, therefore, which is presented by the present record is, whether Elizabeth Richardson had a fee or a life estate in the realty embraced in the deed from Areanah Kennedy?

In determining this question we must first consider whether the rule established in *Shelley's case*, applies to the deed which we are now called on to construe.

No question connected with the law has elicited more learning and discussion than that which relates to the nature and operation of this rule, as a principle of law for the interpretation of wills and deeds; and none occupies a more prominent place in the history of the law of real property.

The controversies on this subject from the earliest periods down to the present day, have been vehement, protracted and even bitter, eliciting the profoundest logic, severest criticism, and deepest and most laborious research. In one instance, even, this controversy resulted in the dismemberment of the court of King's Bench, and at another time this renowned discussion, says Chancellor Kent, became so vehement and protracted as to rouse the sceptre of the haughty Elizabeth. The great case for example of *Perrin vs. Blake*, 4 *Burr*, 2579, which excited the most noble and illustrious talents of the age in its discussion through every department of Westminster Hall, originated in the island of Jamaica, as far back as the year 1746. After the case had travelled through the courts of that island, it passed the Atlantic on appeal to the king in council. The final termination (the result at last of compromise) of this protracted litigation was in 1777, after an exhausting controversy of upwards of thirty years. When Lord Mansfield delivered his opinion in *Perrin vs. Blake*, he used certain sarcastic expressions which gave offence to his associate Mr. Justice Yates, who immediately thereupon resigned his seat as a judge of K. B., and was transferred to the C. B. Though volumes have been written upon the subject, and more than a century expended in its investigation, still it to this day remains a fruitful subject of strife and discussion, as the present case abundantly illustrates.

In *Shelley's case*, 1 *Co.*, 104, the rule was laid down, on the authority of a number of cases from the year books, to be, " that when the ancestor, by any gift or conveyance taketh an estate of freehold, and in the same gift or conveyance an estate is limited either mediately or immediately, to his heirs, in fee

or in tail, *the heirs* are words of limitation of the estate, and not words of purchase." Chancellor Kent however adopts the following definition of the rule by Mr. Preston, as being more full and accurate. "When a person takes an estate of freehold, legally or equitably, under a deed, will or other writing, and in the same instrument there is a limitation by way of remainder, either with or without the interposition of another estate, of an interest of the same legal or equitable quality, to his heirs, or heirs of his body, as a class of persons to take in succession, from generation to generation, the limitation to the heirs entitles the ancestor to the whole estate." *Preston on Estates,* vol. 1, 263.

In cases, therefore, where the words "heirs" or "heirs of the body" are used they will be construed to limit or define the estate intended to be conveyed, and will not be treated as words of purchase, and no supposed intention on the part of the testator or grantor arising from the estate being conveyed, in the first instance, for life, will be permitted to control their operation as words of limitation.   In all such cases the estate becomes immediately executed in the ancestor, who becomes seized of an estate of inheritance.   By force of the unbending construction given to these terms, it imputed to the grantor or testator in legal contemplation, an intention to use the terms in their legal sense, and to give them their legal effect, though it should defeat even a real intention to the contrary.   In other words, they are regarded as conclusive evidence of the intent of the testator.

There are however well recognised exceptions to this rule: two of which we will advert to at present, in general terms. In the first place, whenever the testator or grantor annexes words of explanation to the word "heirs," indicating that he meant to use the term in a qualified sense, as a mere *descriptio personarum*, or particular designation of certain individuals, and that *they* and not the ancestor were to be the points or *termini* from which the succession to the estate was to emanate or take its start, then in all such cases where the word *heir* is thus explained or restricted, it is to be treated as a term of purchase and not of limitation.   For example, the expressions,

*heirs now living, children, issue, &c.*, are words of limitation or purchase, as will best accord with the manifest intention of him who employs them. Under this qualification of the rule the intention prevails against the strict construction.

The second exception to which we will advert is, that where the estate limited to the ancestor is an equitable or trust estate, the two estates under the rule in *Shelley's case* will not coalesce in the ancestor; and the result would be the same if the estate for life was a legal estate, and that limited to the heirs an equitable estate. *Horne vs. Lyeth*, 4 *Har. and Johns.*, 432.

Whatever may have been the origin or philosophy of this rule, whether it was introduced to secure to the lord of the fee the fruits and incidents of wardship and marriage which he had a right to claim from the heir; or whether the more reasonable idea of Mr. Justice Blackstone, be correct that the rule had its origin in the desire to facilitate the alienation of land, and to throw it into the track of commerce, one generation sooner by giving the power to the ancestor of immediate disposition of the estate to the exclusion of the heirs, the rule with its qualifications must nevertheless prevail as a part of our system of real law, because it has been fully recognised and adopted as the settled law of Maryland. The court in *Horne vs. Lyeth* say, "to disregard rules of interpretation sanctioned by a succession of ages, and by the decisions of the most enlightened judges, under pretence that the reason of the rule no longer exists, or that the rule itself is unreasonable, would not only prostrate the great land marks of property, but would introduce a latitude of *construction*, boundless in its range and pernicious in its consequences."

The rule applies clearly to the deed we are now considering, unless it can be shown that it falls within one or the other of the enumerated exceptions. Did then Mrs. Kennedy use any apt words in the deed to indicate that the heirs of Mrs. Richardson, and not she herself, were to be the *termini* from which the succession was to commence, and thereby create in Mrs. Richardson a mere life estate? In other words, are there any expressions in the deed sufficient to convert the words "legal

heirs," from words of limitation into words of purchase? There are none in our opinion capable of restricting the terms to particular individuals, instead of the entire legal representatives of Mrs. Richardson as a class. On the contrary the language employed is of the most general character, and is indeed as full and as comprehensive as that employed in *Shelley's case* itself, and we cannot suppose that it will be seriously contended that the present deed, if it were a conveyance directly to Mrs. Richardson herself, without the interposition of the trustee, and she was a *feme sole*, would not be embraced within the operation of the rule.

But in the second place, it is contended that under the peculiar provisions of the present deed an estate of a different nature has been created in Mrs. Richardson, from that conferred upon her heirs, and that therefore the two will not incorporate in Mrs. Richardson, thus bringing the case within the operation of the second exception to the rule.

To avoid such a conclusion it is argued by the appellee on the one hand, that the present instrument is a deed of bargain and sale, and that as such, the use was executed in Ridgely the trustee, and that the limitations to use, are mere trusts in equity, and that both Mrs. Richardson and her heirs are *cestui que trusts* seized only of an equitable estate, and that as such they will coalesce in Mrs. Richardson under the rule. On the other hand it is contended, that the intention of the grantor should prevail, and that the present deed should be treated as a *feoffment* to accomplish that purpose. If regarded as a *feoffment* it is said that the legal estate would be executed in the *heirs* of Mrs. Richardson, but that she herself would take but a mere equitable life estate.

Whether the present deed, as an abstract question, be a *feoffment* or a *bargain and sale*, is one more difficult than important for us to decide. If it be a case where the *intention* of the grantor is to prevail against the strict rules of interpretation, then this court will construe the deed as a *feoffment* or a *bargain and sale* as will most effectually accomplish that intention.

In this connection it becomes necessary to inquire when the legal estate vests in the trustee, and thereby becomes a trust estate, or when it vests in the *cestui que use*, under the statute of uses.

A use is, where the legal estate of lands was in a certain person, and a trust was also reposed in him, that some other person should take and enjoy the rents and profits. In other words, a use was a mere confidence in a friend, (before the statute of uses,) that the feoffees to whom the lands were given, should permit the feoffor, and his heirs, and such other person as he might designate, to receive the profits of the land. *Gilbert on Uses*, 1.

The whole system of uses, however, was abolished or remodeled by the statute of 27 *Henry* 8, *chap.* 10, commonly known as the statute of uses. By the provisions of that statute the use was transferred into possession by converting the estate or interest of the *cestui que use* into a legal estate, and by destroying the intermediate estate of the feoffee. The strict construction which was given to this statute by the judges of its time, and the inconvenience and injustice which thereby followed, led, after a lapse of time, through the interposition of a court of chancery, and the ingenuity and learning of lawyers, to the establishment of a regular and enlightened system of trusts. In this way uses were partially revived under the name of trusts. In regard to this revival of the equity jurisdiction in respect to trusts, Lord Mansfield has said in *Burgess vs. Wheate*, 1 *Bl.*, 123, "that it has not only remedied the mischiefs of uses so much complained of, but has given occasion to raise up a system of equity, noble, rational and uniform, in place of a system at once unjust and inconvenient. Trusts are made to answer the exigencies of families, and all purposes, without producing one inconvenience, fraud or private mischief, which the statute of *Henry* 8, meant to avoid."

A trust therefore is a use not executed under the statute of *Hen.* 8, in the *cestui que use*, but the legal estate is vested in the grantee or trustee.

It becomes, however, frequently a matter of difficult solution

to determine when the estate is vested under the statute in the *cestui que use,* or when as a *trust* it vests in the trustee; and the present case is one by no means free from difficulty on this point.

The inquiry here is, in whom did the legal estate vest under the present deed? It is to be observed that such a trust as is here contended for, might readily have been created by express terms: as for instance, if the property had been con-, veyed to Ridgely and his heirs, to the use, or unto the use of him and his heirs in trust for Mrs. Richardson, it would have been a complete disposition of the whole legal estate to the trustee. 2 *Crabb's Law of Real Prop.* 508. In such a case the use and possession which constitute the legal estate are both vested in the trustee, while the rents and profits would belong to the *cestui que use.* But the supposed case is not this case. If there is a trust in Mrs. Richardson it is not created by express, technical terms, but it results from the *intention* of the grantor to do so, as manifested upon the face of the deed, an intention so clear as not to be defeated or controled by the strict rules of interpretation. It is clear that the mere interposition of a trustee to protect and secure a trust estate in a third person even though a married woman, will not prevent the use from being executed in the *cestui que use,* unless there is attached to the trustee the performance of some active functions or duties in order to support the trust. And a distinction has been taken between a devise or deed to a person in trust *to collect and pay over* the rents and profits to another, and a devise in trust to permit another to *enjoy* the rents and profits. In the first, the use is executed in the trustee, in the second, in the *cestui que use.* It would follow then; was Mrs. Richardson not a married woman, or was not the estate by the terms of the deed limited to her *sole and separate* use, independent of her husband, that this would be a conveyance under the statute, and would vest the legal estate in her, notwithstanding her coverture, or the provision that she was to have but a life estate. But in the present case the deed provides that the property shall be held in trust "for her own proper use and benefit, notwithstanding her coverture," &c., and

Ware, *et al.*, *vs.* Richardson.

"as if she was sole and unmarried." As has already been intimated, in all cases where a deed or will involves an object or purpose which cannot be carried into operation without the active agency of the trustee, such as the collecting and paying over of the rents and profits of land to a married woman for her sole and separate use, the execution of conveyances, &c., then it becomes a special trust, and not a use executed in her; and the question in this case is, does the deed impose such active duties upon the trustee as will render it necessary for him to have the legal estate to discharge those duties, or is he a mere nominal, inactive agent, who is embraced within the statute of uses?

Most of the elementary writers broadly assert, that where the trustee is to hold in trust for the *sole and separate* use of a married woman, it is a trust, and not a use executed under the statute. 1 *Cruise Dig.* 456. 2 *Crabb's Law of Real Prop.*, 509. *Clancy on Hus. and Wife*, 256. It is however to be regretted, for the sake of the simplification of this question, that the adjudications cited by the books, do not with unanimity sustain the proposition to the length to which it is stated. Most of the cases cited by the text writers will be found to relate to deeds or wills which impose upon the trustee some active functions, such as collecting and paying over of rents, &c., and while therefore they do not contradict the proposition, they notwithstanding do not sustain it as it is broadly announced. *Nevil vs. Saunders*, 1 *Vern. Rep.*, 415. *Say and Seal vs. Jones*, 1 *Ab. Equity Cases*, 383. 8 *Viner's Alr.*, 262. *Lord Ch. G. Holt, in South vs. Alleine*, 1 *Salk.*, 228. *Griffith vs. Smith, Moore*, 753. *Bush vs. Allen*, 5 *Mod. Rep.*, 63; and a number of other cases to the same purpose might be cited.

The intention of the grantor is to prevail in cases like the present, but with this qualification, that it must not contravene or defeat the established rules of construction, or in other words the intention is to be ascertained by the legal rules of interpretation. Unless therefore this deed, in accordance with one of those rules assigns to the trustee the performance of some

duty necessary for the enjoyment of the estate by the *feme covert*, the legal estate would not vest in the trustee.   It would seem to follow as a necessary consequence, from the very nature of the present transaction, that a deed to a trustee for *the sole and separate use* of a married woman, would imply that the trustee's aid was invoked, and his active services required, to support the independent character of the wife.   The rights and powers of married women are ordinarily merged in those of their husbands, and whenever it becomes important to invest her with sole and independent powers, it becomes necessary that that character should be exercised through the medium of a trustee.   It is now settled that where bequests or conveyances are made to married women for their separate use, without the nomination of trustees, the husbands in equity will be considered as trustees for their wives, and will be required to comply with the intention of the donor.   *Clancy on Hus. and Wife*, 257.   A separate estate in real property could not be enjoyed by a married woman unless through the interposition of a trustee, which circumstance of itself would imply the performance of some active duties on his part.   Not so however with persons not laboring under the same disabilities with married women.   In such cases no intervening agent is necessary to enable them to enjoy the property, and therefore the legal estate is vested in them when it would not be in a *feme covert*.   Thus in the case of *Broughton vs. Langley*, 2 *Ld. Rayd.*, 873, where lands were devised to trustees and their heirs, to the intent to permit A to receive the rents for his life, &c., it was determined that this would have been a plain trust at common law, and as such executed by the statute.   And so it would have been even if the *cestui que trust* were a married woman; provided the estate was not limited to her sole and separate use.

It is true that there are some cases which have carried this doctrine so far as to embrace within its operation deeds and wills conveying property *to married women for their separate use*, and have declared the estate to be executed under the statute in the *feme covert*.   The only cases brought to our notice *favoring* this doctrine are *Williams vs. Waters*, 14.

*Mees. and Wels.*, 166. *Douglas vs. Congreve*, 1 *Beavans*, 59. *And South vs. Alleine*, 1 *Salk.*, 228. In the first of those cases, *Williams vs. Waters*, it would seem that a different interpretation would have been given to the instrument by a court of chancery, from a remark made by Rolfe, Baron, in his opinion. He observed, "it is said we are to construe the deed otherwise, because so the intention of the parties will be effected; but so it may in other ways; it will now, by the interposition of a court of equity." And Baron Parke says, "we cannot collect clearly from the words of the deed, that they intended to give the trustees an *active trust*, to exclude the husband from control, by giving the estate to the trustees in order to pay over the rents and profits to the wife." Thus this case sanctions the principle, that where an *active trust* is imposed upon the trustee he takes the legal estate. The case of *Douglas vs. Congreve* is, in important particulars, dissimilar from the case now before us. There the devise was to the wife for her life, for her independent use and benefit, followed by a direct devise after her death, to her husband, for his natural life, with remainder to the use of the heirs of her body, &c. The court decided, that the strict rules of construction were to prevail, because an intention to the contrary was not sufficiently manifest on the face of the will. The case of *South vs. Alliene* it must be admitted, directly supports the views of the appellee's counsel. But the authority of that case is greatly weakened, if not entirely overthrown by the fact that C. J. Holt, dissented from the opinion of Rokesby and Eyre, justices, and that the opinion of the chief justice has been repeatedly sustained by subsequent decisions of the highest authority.

The position assumed by the counsel for the appellee, that it does not necessarily follow by vesting the legal estate in the wife, that thereby you establish the marital rights of the husband in opposition to the contrary intention of the grantor, we think is not sustained by the authorities. In most of the cases it is conceded, that by executing the use in the wife the husband acquires control over the property, and that very result is assigned as a reason why a different construction should be given to the instrument, in order to effectuate the intention of

the grantor. In the case of *Bush vs. Allen*, 5 *Mod. Rep.*, 63, Justice Rokesby in reply to the argument that the legal estate vested in the wife, remarked, "but then the husband shall intermeddle, when the divisor intended to exclude him." And in the great case upon this subject, *Harton vs. Harton*, 7 *Term. Rep.*, 652, Lord Kenyon said, "that whether this were a use executed in the trustees or not must depend upon. the intention of the devisor. This provision was made to secure to a *feme covert* a separate allowance, to effectuate which it was essentially necessary that the trustees should take the estate, with the use executed, for otherwise the husband would be entitled to receive the profits, and so defeat the object of the devisor." And also in the case of *Williams vs. Waters*, 14 *Mees. and Wels.*, 166, Parke, Baron, concedes, that the husband could not be excluded if the legal estate vested in the wife.

In the consideration of this case it would be difficult for us to refer to the numerous cases which relate to the subject, much more to attempt to reconcile them with each other. That there is some conflict of opinion upon the subject, cannot be denied. The later, and more modern decisions, however, seem to favor a more liberal construction of deeds and wills in order to reach the real intention of their makers, and therefore in all cases where an estate is devised or conveyed to trustees for *the separate use of a married woman* and her heirs, this court will, if possible, so construe the instrument as to vest the legal estate in the trustees, because such a construction will best effectuate the intention of the donor. We think this conclusion would follow from the general principles which we have endeavored to maintain in this opinion, and is warranted by a current of decisions of the highest weight and authority. The case of *Harton vs. Harton*, 7 *Term. Rep.*, 652, fully sustains our views, and no higher authority can be invoked on any subject than that of Lord Kenyon. *Clancy on Husband and Wife*, 256, broadly maintains the very proposition for which we are contending. He says, "where lands are devised in trust, as to the rents and profits, for the sole and separate use of a married woman, it is immaterial whether the trust be

Ware, *et al.*, *vs.* Richardson.

declared to be 'to *pay* the rents and profits to her' or 'to *permit* her to receive the rents and profits,' as in either case, it would be held that the use was not executed." In addition to the cases we have already cited, we refer to *Hawkins vs. Luscombe*, 2 *Swans.*, 391. *Ayer vs. Ayer*, 16 *Pick.*, 327. *Franciscus vs. Reigart*, 4 *Watts*, 109. *The Escheator of St. Philips and St. Michaels' vs. Smith*, 4 *McCord*, 452. The cases in *Pick. and McCord* are in all respects like the case we are now considering, and fully sustain the conclusions to which we have come. In both those cases the question grew out of a *deed*, and very similar to the one now before us. In each, the only duty imposed upon the trustee was to hold the estate for the *sole and separate* use of the wife, and it was held in both cases that, because a separate provision was intended to be made for the wife, it was sufficient to prevent the execution of the estate in her. In the case of *Ayer vs. Ayer* the court has gone quite at length into the subject, and reviewed many of the leading cases relating to it.

It has been urged that more strictness is required in construing deeds than wills, and that as this is a deed the technical rules of construction should apply, with unbending force. To this proposition we do not assent. *Cruise*, 1 *vol.*, 459, says, that the same mode of construction is adopted in cases of deeds as in cases of devises, in questions like the present; and the same rule is recognised in *Ayer vs. Ayer*, 16 *Pick.* 330.

The case of *Matthews' Lessee vs. Ward*, 10 *Gill and John.*, 443, has been pressed upon us, as a controlling authority in support of the proposition that the present deed should be treated as a deed of *bargain and sale*. In this respect we do not concur with the appellee's counsel. That case has no especial bearing upon the one we are now considering, except it be to establish the general proposition that deeds of *bargain and sale* have nearly superseded all other modes of conveyance for passing real estate in Maryland, and the other more important and pertinent principle to the present controversy that our courts in construing deeds will effectuate, as far as possible, the intention of the grantor. Archer, J., who delivered the opinion in *Matthews vs. Ward*, admits expressly

that the deed in that case might be construed to be a *feoffment*, if the intention of the grantor would warrant such a construction, and it is declared to be a deed of bargain and sale, because such a view comports with what was supposed to be the intention of the grantor. Whenever a conveyance may take effect either at common law or under the statute of uses, it shall operate at the common law, unless the intention of the parties appears to the contrary. 2 *Saund. on Uses and Trusts*, 50, (*Marg.*)

We are of opinion therefore that the present deed creates but a mere equitable life estate in Mrs. Richardson; and that it executes the legal estate in her heirs.

The next question which we are called upon to consider, no less important than the first, is the nature and effect of the decree passed on the 26th of May 1847, by Baltimore county court, upon the bill and answer.

A further statement of the facts of the case here becomes necessary. The answer of the defendants to the bill of complaint admits all the preliminary facts stated in the bill as to the death of the parties, the granting of letters testamentary and of administration, &c. The answer then proceeds to admit that the complainant has filed two accounts as stated in the bill, and that it appears that the estate of Eliza is indebted to the estate of Robert, her husband, in the sum of $496.92, but that having no knowledge of the debt of $345, alleged to be due the complainant, the defendants neither admit nor deny the same. The answer denied the liability of the real estate to be sold for Mrs. Richardson's debts. The answer concludes by stating that the real estate is not susceptible of division, and assents to its being sold under a decree, and that the proceeds should be brought into court to be distributed according to the respective titles of the parties. Upon the filing of this answer it was agreed between the parties that the cause should be submitted upon bill and answer without argument. Thereupon on the 26th May 1847, a decree was regularly passed ordering a sale of the property by trustees, and that the money should be brought into court to be distributed under its direction. In due course the property was sold, and the sale re-

ported for ratification, and by agreement of the parties was accordingly ratified on the 12th of October 1847. Subsequently the auditor stated an account distributing the proceeds of the property among the creditors of Mrs. Richardson. To this account the defendant filed exceptions on the 30th March 1848, based mainly on the ground that the property was not liable for Mrs. Richardson's debts, and that the item in the account for the two negro women was improperly allowed the complainant. These exceptions were overruled and the auditor's account finally ratified. From the order overruling the exceptions and ratifying the account the present appeal was taken.

From what we have already said it will be seen, that unless the appellants are precluded by the decree of May 1847 from presenting the question of title upon the present appeal, the real estate in dispute is not liable to be sold for the payment of Mrs. Richardson's debts. We are then to consider whether that decree was in the nature of a final decree, or whether it was, under the circumstances of this case, in the nature of an interlocutory or conditional order. The act of 1830, ch. 185, deprived the party aggrieved of his right to an appeal from any decree or order, unless it be a final decree, or order in the nature of a final decree; and although the right to an immediate appeal is restored by the act of 1841, ch. 11, it has been adjudged, that the party is at liberty to waive this right, and, on an appeal from the final decree or order, may allege error in all previous interlocutory orders passed in the progress of the cause. 3 *Gill*, 138, *Dugan vs. Gittings.* If this decree be therefore not a final decree, it is subject to review on the present appeal, unless the right has been lost by some act of the party. In some cases it becomes a very difficult question to determine, what is or what is not a final decree. It would seem, that an order or decree finally settling any disputed right or interest of the parties would be a final decree, and as such, would warrant an appeal. 1 *Gill and Johns.*, 309, *Hagthorp vs. Hook.* The act of 1830, it is true, expressly enumerates among the decrees which are not to be regarded as final, *those for the sale of real estate,* but it cannot be supposed that that

act intended to embrace a case where the liability of the property to be sold was the very question to be determined by the court, and were it not for the peculiar circumstances of this case, it would hardly be seriously contended, that if the issue had been made upon the question of title and decided upon that question, the decree would not have been final upon that point as to all parties. The cases cited by the appellants' counsel do not determine a decree like the present to be a mere interlocutory order, and the language of Judge Martin, in *Dugan vs. Gittings*, is but a mere repetition of that of the act of 1830, and determines nothing in the present case.

If the present controversy related to the rights of the purchaser under the decree in question, there could be no doubt it would be regarded as a decree sufficient to pass to him a good title against the parties to the proceedings. But the present case does not seek to affect *the title* under this decree. It is a controversy among the parties claiming the proceeds of the sale, and not the property itself. It would seem that it was the intention of the parties to these proceedings to reserve or postpone the settlement of their respective claims to the property, until the proceeds of sale were brought into court to be distributed under its direction; and we think that it is equally clear, that the court was but carrying out that intention or *quasi* agreement when it passed the decree for the sale in the first instance. The court pass the decree for the sale without comment or opinion, but when called upon to settle the rights of the parties to the fund arising from the sale, the same judge who passed the first decree files his opinion at length, thereby clearly showing that, for the first time, he regards the question of title as presented to his consideration.

We fully concur with the learned counsel for the appellee, that decrees and judgments should not be dealt lightly with, or easily disturbed when rights have been settled by them. But we do not regard this case as coming under this general rule. The parties to these proceedings cannot be prejudiced by the views we have expressed. If the appellants' view be correct, the final adjudication of the case is only postponed for the action of the court upon the auditor's account, where both

parties have an opportunity fully to be heard. If on the other hand that final adjudication is to be taken as having been made, as is contended by the appellee, when the sale was ordered, it will be readily seen that one of the parties, at least, has had his rights passed upon without an opportunity, through mistake, of being heard.

It is by no means an uncommon practice for courts of equity to pass decrees reserving the equities of the parties for some future decree of the court. And although this was not done in the present instance in express terms, yet we have no difficulty in coming to the conclusion that such was the design of both the court and the parties when the decree for the sale was passed. Under such circumstances this court could not treat that decree as so far final and conclusive upon the parties, as to preclude upon the present appeal the consideration of the question of title. We consider one of the very conditions upon which that decree was assented to, was that the question of title should be postponed, till the fund arising from the sale was to be distributed. Such an arrangement seems to have been the result of a family understanding, for the settlement of this estate, and if, in carrying out that arrangement, one or the other of the parties has gained a technical legal advantage which was not anticipated or provided for, this court will, if possible, defeat such result and effectuate the intention of the parties. This would have been a totally different case, if this decree had been the result of a litigious, instead of an amicable proceeding, prosecuted according to the strict rules of pleading and evidence. The parties would then have been held strictly to all the legal consequences of such a decree, and so they will now, so far as the rights of third parties, not privy to the agreement, may be affected by the present decree.

These principles, we think, are sustained by the case of *Glenn, Adm'r, vs. Hebb*, 12 *Gill and Johns.*, 271. In that instance, *by the agreement of the parties*, the case was to be submitted to the chancellor on bill, answer and general replication, to determine whether there should be a decree to account. In fact no replication was filed. Were the parties held strictly to the consequence of a submission on bill and answer alone,

as under other circumstances they would have been? No! Judge Archer, who delivered the court's opinion, says: "We must, as we apprehend, however, consider the case as if a replication had been in fact filed, for the agreement indicates that the case was to be heard by the chancellor upon bill, answer and replication. Such was the clear understanding of the parties, and we cannot, without injustice, consider the answer as not replied to."

We mention this case to show, that under certain circumstances this court will modify the rigid rules of practice, and temper the harsh consequences of decrees, to promote the ends of justice and effectuate the intention of parties.

It has been argued that the supposed agreement upon which the decree was based, has virtually converted a proceeding under a creditor's bill into one for a sale for distribution, and that a court of chancery has no such power to convert the one proceeding into the other, nor to blend the two together, that therefore the attempt to do so is irregular and void. We do not deem it necessary to say whether this has been done or not in this case. But if admitted, the question before us is not whether a creditor's bill, and a bill for distribution among heirs can be united in the same proceeding, or whether the one can be converted into the other; but the question is, whether, after either has been done in the court below by the assent and agreement of the parties, can advantage be taken of the irregularity, if such it be, in this court upon appeal? We think it cannot be.

The bill on its face is a creditor's bill. It sets forth such facts as, if admitted or proved, would have entitled the complainant to a decree. The answer denied several important allegations and fails to admit others. In conclusion the answer states that they, the respondents, believe that the property is not susceptible of equal division, *and agree that it should be sold by decree, and the proceeds brought into court to be distributed according to the respective rights of the parties. No replication* was put in and no proof offered. It was then agreed, that the cause should "be submitted on bill and answer without argument *for decree*." Thus the answer is to

Ware, *et al.*, *vs.* Richardson.

be taken as true, as it was not put in issue by a replication. It is therefore manifest that no decree could be passed except upon the agreement in the answer, consenting to a sale, and in assenting to the decree the complainant took it upon the conditions annexed to it by the defendants, namely, that it should be a decree for a sale, reserving for adjustment and decision the distribution of the proceeds, until they should be brought into court, and then "to abide the decision of the court as to a distribution thereof, (in like manner as if said property remained unsold,) upon the respective titles of the parties claiming an interest therein." Thus it is perfectly manifest, as has already been observed, the parties intended the decree to conclude no rights, *further than to effect a sale of the property and to pass the title out of themselves,* and that afterwards the proceeds should be brought into court, to be distributed according to the rules of equity. The decree, accordingly, simply directs a sale, and the proceeds to be brought into court. It does not, in accordance with the usual form under a creditor's bill, *direct the land, or so much thereof as may be necessary, to be sold for the payment of the debts of the deceased.*

When the proceeds are brought into court, and the auditor states an account allowing the claims of the creditors, exceptions are filed and argued, and the court decide upon them precisely as if the rights of all parties to the fund were reserved for adjudication at that time, and not as though the decree had conclusively established the claim of the complainant and the liability of the property, as is now contended. We consider the agreement assenting to the decree upon the terms mentioned, as dispensing with the proof necessary to support the bill of the creditor, and as authorising a sale under that bill, but expressly reserving the equities of the parties. It is not a case of consent giving jurisdiction. The bill states facts which give jurisdiction, and the agreement but dispenses with proof and matter of form, and submits to such a decree as was clearly within the power of the court to pass without an agreement upon proper averments and proof. There can be no doubt but that the agreement can have the effect to suspend or take

Ware, *et al.*, *vs.* Richardson.

away that conclusive character, which in ordinary cases would attach to the decree. It is simply taking a decree upon terms proposed by the defendants and accepted by the complainant; and can it be seriously contended, that a court of equity will not give efficacy to those terms?

The questions arising upon the present appeal are as anomalous as they are numerous and intricate. The conclusions to which we have arrived, render the consideration of many of those questions unnecessary. We have endeavored to promote as far as possible the justice of the case, and to carry into effect the manifest design of the parties, without, at the same time, violating any of the established rules of equity practice. The case, it must be conceded, is *sui generis*, and we expect *never to look upon its like again.*

Under the circumstances enumerated and for the reasons assigned, we are of opinion, and so decide, that the rights of the several parties to the fund arising from the real estate are open for adjudication upon the present appeal.

The result of our deliberations upon the whole case is, that the creditors of Mrs. Richardson have no claim upon this real estate, and that the auditor has erroneously stated the account allowing those claims. We will sign a decree reversing the decree of Baltimore county court and remanding the cause, with instructions to the auditor to state an account, distributing the proceeds of sale among the children or heirs of Mrs. Richardson, and not among her creditors, subject however to any claims which may be established against either of said heirs.

*Decree reversed and cause remanded.   The costs in*
*both courts to be paid out of the proceeds of sale.*